## THE AKER.

(District Court, D. Maryland. November 4, 1910.)

Collision (§ 91*)—Steamship and Tow Meeting—Violation of Passing Rules.

A collision in the cut off channel in Chesapeake Bay in the daytime between the steamship Aker, passing northward, and one of four barges in tow of a tug, passing southward, *held* due solely to the fault of the Aker, which, being in about the middle of the 600 foot channel, signaled the tug to pass starboard, contrary to the rules and when the wind and tide tended to swing the tow, which was 1,500 feet long, to the westward side of the channel; the Aker also, after her signal was assented to, having failed to carry it out by going as far toward the west side of the channel as she could and should have done.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 187–192; Dec. Dig. § 91.*

With or between towing vessels and vessels in tow, see note to The John Englis, 100 C. C. A. 581.]

In Admiralty. Suit by William Cooper, as master, for himself and others as owners, of the barge Diamond State, against the steamship Aker. Charles Gring, owner of the Prudence, was impleaded. Decree for libelant.

The barge, Diamond State, on the morning of March 12, 1910, was damaged in a collision between it and the Norwegian steamer Aker in what is known as the cut off channel in the Chesapeake Bay. She was at the time in the tow of the tug Prudence. The barge libeled the Aker. The latter brought in the tug under the rule. The Prudence started from Baltimore with four barges in tow. The one which towed immediately behind the tug was laden. The other three were light. The entire length of the flotilla from the stem of the tug to the stern of the rearmost barge was somewhere between 1,500 and 1,700 feet. It was daylight. There was no obstruction to vision. The wind was blowing from the northeast somewhere from 10 to 15 miles an hour. When the first signal was given, both the Aker and the tug and its tow were in the cut off channel, which is 600 feet wide. The Aker opened communication by blowing two blasts, which were answered by the tug with two blasts. Subsequently the Aker again blew two blasts, which were unanswered. Shortly before the collision, she reversed her engines, and about the time of the collision dropped her port anchor. The effect of reversing her engines was to throw her bow to starboard. The bow of the Aker came in contact with the starboard side of the barge about amidships.

Lewis & Adler and Arthur D. Foster, for libelant.

Howard M. Long, Edward E. Blodgett, and Whitelock, Deming & Kemp, for respondent Gring.

Robert H. Smith and Harry N. Abercrombie, for other respondents.

ROSE, District Judge (after stating the facts as above). The steamer was clearly in fault. There can be no doubt on that question since we have seen on the stand the pilot in charge of the Aker that morning and have heard his testimony. The blame may rest on her master, whom her pilot says lost his head, or it may rest on the pilot himself. In either event the steamer is responsible.

According to the story told by her witnesses, they saw the Prudence and its tow when the latter was from two to three miles away.

The tug and her barges were then all on the eastern side of the channel, or the tug was on the eastern side of the channel and the barges crossing the channel to the eastern side. The Aker was in the middle of the channel a little to the east or a little to the west, but substantially in the middle. It was her duty to keep to starboard passing port to port. Sometimes it may appear to one of the vessels that it will be safer and more convenient to pass on the other side. If it makes the attempt and succeeds, well and good. Its judgment has been vindicated. If it takes the responsibility, however, of substituting its judgment for the rules of navigation, and fails, it must take the responsibility of its failure.

There has been great stress laid by the able and ingenious advocate for the Aker on the fact that wind and tide tended to send the tow to the westernmost or port side of the channel. That fact must have been quite as obvious to those on the bridge of the Aker on the morning of the collision as it can be in this courtroom. If such were the conditions of wind and tide, there was all the more reason why the Aker should not have attempted to change the rule of the road. As long as she kept to the starboard side, wind and tide combined to keep the Prudence and her tow out of the way. In spite of these obvious considerations, the Aker elected to pass to leeward of the Prudence. When the Prudence heard the signal of two blasts from the Aker, she could have done one of two things. She could have answered affirmatively, as she did do. In that event, she was bound to do her best to keep as far to the eastward as she could; or she might have blown the danger signal. She could not cross signals. It may be that to have given the danger signal would have been the wisest course. If I thought it probable from the testimony that the Aker after having given the signal indicating that she would go to the port side of the channel had taken any pains to go as far to the port side of the channel as she could, and the collision had then happened, the question of whether the tug was also in fault for having acquiesced under the circumstances in so dangerous an attempt would have to be considered. In point of fact, however, the testimony leaves no doubt in my mind that the Aker did not respect her own signals.

At the time of the collision, she may have been a little to the west of the center of the channel, but even that is very doubtful. The Aker anchored at the moment of the collision. Wind and tide and the force of the collision itself would all have tended to throw her stern further to the westward than it was just before the collision. Yet it is proved to demonstration by the testimony of disinterested witnesses that at least two large steamers after the collision and while she was still anchored passed without difficulty between her stern and the west side of the channel.

In short, the Aker, after having made the collision possible by signaling that she would pass starboard to starboard, made it certain by failing to go as far to the port side of the channel as she could and should have done.

Under those circumstances, she must be held solely in fault.